## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) SHELLY CALLIER, as Co-Administrator of the Estate of KELLIE WRIGHT, deceased,<br><br>    Plaintiff,<br><br>v.<br><br>(1) POTTAWATOMIE COUNTY PUBLIC SAFETY CENTER TRUST,<br>(2) DOES ## 1-5,<br><br>    Defendants. | Case No.: CIV-23-594-G<br><br>JURY TRIAL DEMANDED<br><br>ATTORNEY'S LIEN CLAIMED |

## **COMPLAINT**

**COMES NOW**, Plaintiff Shelly Callier ("Plaintiff"), as the Co-Administrator of the Estate of Kellie Wright ("Ms. Wright" or "Kellie Wright"), deceased, and for her causes of action against the above-named Defendants, alleges and states the following:

## **PARTIES, JURISDICTION AND VENUE**

1. Plaintiff Shelly Callier is a citizen of Oklahoma and the duly-appointed Co-Administrator of the Estate of Kellie Wright. Shelly Callier and Kellie Wright were married. The survival causes of action in this matter are based on violations of Kellie Wright's rights under the Fourth, Eighth, and/or Fourteenth Amendments to the United States Constitution.

2. Defendant Pottawatomie County Public Safety Center Trust ("PCPSCT") is a Public Trust, created pursuant to a certain "Trust Indenture" and the provisions of 60 Okla. Stat. § 176, *et. seq.* The PCPSCT was at all times pertinent hereto, responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of the Pottawatomie Public Safety Center ("PCPSC" or "Jail"), including the policies, practices, procedures, and/or customs that violated Ms. Wright's rights as set forth in this

Complaint. The PCPSCT was, at all pertinent times, responsible for staffing the Jail and overseeing its day-to-day operations. At all pertinent times, the PCPSCT was acting under color of State law, as set forth herein.

3. Defendants DOES ##1-5 are detention and medical staff, who were, at all times pertinent hereto, employed by PCPSCT/Pottawatomie County. Plaintiff cannot identify Defendants DOES ##1-5 by name at this time. Defendants DOES ##1-5 were acting under color of law and within the scope of their employment with PCPSCT/Pottawatomie County.

4. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourth, Eighth, and/or Fourteenth Amendments to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

5. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourth, Eighth, and/or Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

6. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

8. Paragraphs 1-7 are incorporated herein by reference.

- **Facts Specific to Kellie Renee Wright**

9. On July 9, 2021, Kellie Wright was staying at the Grand Casino Hotel & Resort ("GCHR") in McLoud, Oklahoma for the 75th Annual Oklahoma Society of Accountants convention.

10. At the time of the events described herein, Ms. Wright was the co-owner of a tax service in Broken Arrow, Oklahoma and a contributing member of her community.

11. At or around 8:00 p.m. on July 9, 2021, casino employee Suzette Baptiste noticed Ms. Wright's hand was stuck in an elevator at the casino. Ms. Baptiste contacted casino security to assist Ms. Wright, but there was no disturbance reported by Ms. Baptiste at the time.

12. Citizen Pottawatomie Nation Tribal Officer/Pottawatomie County Sheriff's Officer/McLoud Police Department Officer/Tecumseh Police Department Officer Orrin Beckham ("Beckham"), who was cross-commissioned by these four law enforcement entities, then responded to the security request.

13. When Beckham encountered Ms. Wright, she was in obvious mental and physical distress. For example, Ms. Wright told Beckham that she had "talked to God" and that "she was going to die."

14. At the time, it was obvious that Ms. Wright was experiencing an emergent health condition(s) requiring immediate medical assistance.

15. However, Beckham, along with GCHR Security Supervisor Travis Nolen ("Nolen"), tackled Ms. Wright to the ground and placed her in handcuffs for a purported investigatory detention.

16. After apparently struggling to communicate with Ms. Wright, Beckham took her to his patrol unit and proceeded to arrest her for assault and battery on an officer, resisting, obstruction, and public intoxication.

17. However, evidence that Beckham thought to be "possible narcotic usage" according to his Probable Cause Affidavit — namely, symptoms such as profuse sweating, dilated pupils, slurred

speech, blood-shot eyes, and sporadic hand movements — were actually signs and symptoms of an emergent medical condition(s) affecting Ms. Wright.

18.  Nevertheless, at or around 9:00 p.m. on July 9, 2021, Beckham delivered Ms. Wright to the Pottawatomie County Public Safety Center ("Jail") "without further incident."

19.  On information and belief, during the booking process, PCPSCT employees, Defendants DOES ##1-5, utterly failed to conduct a proper medical intake screening process for Ms. Wright, despite Ms. Wright's obvious distress.

20.  On information and belief, during the booking process, Ms. Wright was confused, disoriented, delirious, and otherwise in obvious need of emergent medical attention. Indeed, the Medical Examiner ("ME") who performed the autopsy on Ms. Wright would later report that she was "incarcerated, ***with altered mental status***." (Emphasis added).

21.  On information and belief, instead of assuring that Ms. Wright was medically fit for booking by a qualified professional, DOES ##1-5 simply placed her in a holding cell.

22.  On information and belief, DOES ##1-5 failed to place Mr. Wright on protocols for allegedly intoxicated inmates or inmates with serious medical conditions; and failed to secure increased supervision for Ms. Wright.

23.  On information and belief, DOES ##1-5 also failed to refer Ms. Wright to a medical provider, and, upon information and belief, Ms. Wright was never referred to a medical professional by any Jail staff on shift nor was she assessed or treated by any medical professional while she was detained at the Jail.

24.  On information and belief, for many hours at the Jail, Ms. Wright continued to display obvious signs of a serious and emergent medical need, including disorientation, confusion, and delirium.

25. On information and belief, Ms. Wright was not regularly monitored or supervised during the time she was incarcerated at the Jail, despite the precarious state of her health.

26. On information and belief, Ms. Wright ***never*** received a medical or toxicology screening, was *never* medically assessed by any health care professional, was not evaluated by anyone at the Jail for any medical conditions or complications, and she otherwise was not assessed for any intoxicating substance in her bodily system or disease that may have contributed to behavior one could construe as appearing intoxicated.

27. Rather, Ms. Wright was experiencing a traumatic and severe medical and mental health crisis, but she was left to languish at the Jail until she succumbed to her condition(s)

28. Even if Jail staff, including DOES ##1-5, believed Ms. Wright was intoxicated, they failed to comply with the essential standards for receiving screening of the National Commission on Correctional Health Care (NCCHC). According to the NCCHC, "[s]creening is performed on all inmates upon arrival at the intake facility to ensure that emergent and urgent health needs are met." However, upon information and belief, Ms. Wright did not receive any medical evaluation.

29. According in NCCHC guidance:

> Reception personnel need to ensure that people who are unconscious, semiconscious, bleeding, **mentally unstable, severely intoxicated, exhibiting symptoms of alcohol or drug withdrawal, or otherwise urgently in need of medical attention are referred immediately for care and a medical clearance into the facility**. This documented clinical assessment of medical, dental and/or mental status **may come from on-site qualified health care professionals or may require sending the individual to the hospital emergency room**…[t]he receiving screening is a process of structured inquiry and observation **intended to identify potential emergency situations among new arrivals and to ensure that patients with known illnesses and those on medications are identified for further assessment and continued treatment**. In jails and juvenile facilities, **the screening may be conducted by health-trained correctional personnel or qualified health care professionals**…[a]dministrators should consider the risks of not knowing an inmate's medical condition (e.g., suicidal ideation, prescription medications, communicable illness symptoms, drug and

5

alcohol use and/or withdrawal symptoms) when designing the intake and receiving screening process…**[s]taff need to get an idea of inmates' urgent health needs, identify and meet any known or easily identifiable needs that require medical intervention**, and identify and isolate inmates who may be contagious. **All immediate health needs identified through the screening process should be properly addressed by qualified health care professionals**. When inmates indicate they are under treatment for a medical, dental, mental health or substance use problem, **health staff should initiate a request for a health summary from the community prescribers after obtaining a signed release from the patient**.

(Emphasis added). *See* https://www.ncchc.org/filebin/CorrectCare/33-2.pdf.

30. Ms. Wright received a level of attention and care nowhere near those stated in the NCCHC guidelines. This abdication of responsibility led to her unfortunate suffering, a worsening of her condition and, ultimately, her demise.

31. On information and belief, Ms. Wright was also subjected to excessive use of force by Jail staff and/or was assaulted by another detainee/inmate.

32. Excessive use of force and/or assault by another detainee/inmate is evinced by the many bruises and wounds all over her body at the time of her death.

33. Indeed, Ms. Wright's health conditions deteriorated to such an extent that, allegedly, Jail staff found her unresponsive in her cell sometime on the morning of July 10, 2021.

34. She was then sent to Saint Anthony's Hospital in Shawnee, Oklahoma. Ms. Wright's family was notified thereafter and travelled to the hospital to be with her.

35. However, it was too late. Plaintiff — Ms. Wright's spouse — was notified upon arrival that she had suffered a loss of oxygen to the brain (anoxic encephalopathy) and had bruising all over her body.

36. Around 8:00 p.m. on July 10, 2021, Ms. Wright died at Saint Anthony's Hospital.

37. A subsequent autopsy by the Office of the Chief Medical Examiner (ME Report) revealed multiple facts pertinent to Plaintiff's allegations, including:

6

- According to medical records from the hospital, Ms. Wright died of anoxic encephalopathy due to cardiac arrest;

- Ms. Wright also suffered from "pulmonary congestion and edema," and "cerebral edema with microscopic evidence of acute ischemia" which contributed to her death;

- Ms. Wright also had "multiple bruises over the body, (anterior shoulders and upper extremities, left chest and abdomen, and anterior lower extremities mostly about the knees). The upper extremities in particular exhibit[ed] multiple discreet and confluent bruises over the dorsal and ventral surfaces with largely confluent bruising and swelling of the wrists and hands";

- Ms. Wright also had "a small, patterned abrasion marks the dorsal ulnar right wrist" and "an irregular, deroofed blister-like wound of the right palm of the hand";

- A examination of Ms. Wright's lungs revealed evidence of "vascular congestion with focal evidence of aspiration";

- Ms. Wright's medical history included "hypertension, chronic ethanol use, depression, and delirium episode during July 2020 hospitalization";

- Ms. Wright did *not* have any illicit drugs in her system at the time of her death, and all positive results from her toxicology screen were consistent with prescription medications she was taking at the time; and

- Alcohol was found in Ms. Wright's system, but it was an extremely negligible amount (32mg/dl).

38. Taken together, the details contained in the ME Report support that:

    a. Based on evidence of pulmonary congestion and cerebral edema, Ms. Wright experienced an episode(s) of bleeding that contributed to her death;

    b. Based on evidence of bruising, abrasion, and blistering, Ms. Wright was restrained during her time in the Jail. In other words, excessive force and/or forms of restraint were used on Ms. Wright while she was incarcerated at the Jail;

    c. Based on evidence of aspiration, Ms. Wright was choking while she was incarcerated at the Jail;

    d. Based on the toxicology results, Ms. Wright's behavior, injuries, and death were not the result of any intoxicating substance(s);

    e. Based on her medical history, Ms. Wright's behavior at the time she presented to the Jail, and her continued behavior while incarcerated for approximately twelve (12) hours, warranted immediate referral to medical personnel for an emergent medical condition(s).

39. These acts and omissions by Defendants, in allowing Ms. Wright to be restrained and excessive force to be used on her, and also in denying her medical care in deliberate indifference to her obvious medical needs, were the proximate causes of her untimely suffering and death.

■ **Facts Specific to the Pottawatomie County Public Safety Center Trust**

40. There is a causal nexus between Ms. Wright's suffering and certain policies and customs in place at the Jail.

41. There is a long and deep-seated history and unabated custom of excessive force/use of restraints and failing to provide adequate medical and mental health care for inmates at the Jail. For instance, there have been negative medical outcomes at the Jail that resulted from excessive force/use of restraints and deliberate indifference to a serious medical need/violations of standard

of care. These include excessive force/use of restraints and deliberate indifference to a serious medical need (in 2019) of inmate Ronald Gene Given ("Mr. Given"), who died from a homicide perpetrated by PCPSCT Jail staff where Mr. Given suffered from multiple system organ failure due to cardiac arrhythmia, the physical altercation with PCPSCT Jail Staff, and a psychiatric disorder.[1]

42. Specifically, PCPSCT Jail staff — in a shocking episode of excessive force/use of restraints and deliberate indifference to a detainee's medical needs — placed Mr. Given in a holding cell despite obvious evidence he was experiencing delirium and/or a mental health crisis, struck Mr. Given, tackled Mr. Given, and used restraints on Mr. Given.[2] Mr. Given then became unresponsive, and ultimately died due to PCPSCT Jail staff's acts and omissions.

43. Upon information and belief, the PCPSCT has consistently and badly failed to supervise its employees at the Jail, and failed to assure that the employees are using appropriate levels of force and providing adequate medical monitoring, assessment, and care of inmates, like Ms. Wright, with serious medical needs.

44. The Tenth Circuit previously upheld a jury verdict against Pottawatomie County, finding and reasoning as follows:

> Having carefully reviewed the trial testimony and other evidence in this case, and viewing all the evidence in Mr. Bass's favor, we conclude that the jury was presented with sufficient evidence to support reasonable inferences that: (1) the Jail maintained a policy and/or custom of permitting jailors to commingle unclassified, intoxicated detainees with unclassified, non-intoxicated detainees, and the Jail's policy and/or custom created a substantial risk that intoxicated detainees such as Mr. Bass would be seriously injured; (2) the Jail was aware of the substantial risk that intoxicated detainees such as Mr. Bass would be assaulted; (3) the Jail disregarded the risk by allowing jailors to inadequately supervise the drunk pod; and (4) the Jail's deficient supervision practices were a proximate cause of Mr. Bass's injuries.

---

[1] *See Kopaddy v. Pottawatomie County Public Safety Center Trust, et al.*, Case No. 20-cv-1280-G (W.D. Okla.), Dkt. #18 at ECF p. 10.
[2] *Id.* at ECF pp. 8-9.

*Bass v. Pottawatomie Cnty. Pub. Safety Ctr.*, 425 F. App'x 713, 720–21 (10th Cir. 2011).

45. On information and belief, the practices as found by the *Bass* Court, have not been corrected, and are causally-linked to the violation of Ms. Wright's constitutional rights.

46. Upon information and belief, the PCPSCT has maintained a custom of allowing excessive force to be used on inmates and operating a system of inadequate medical care for years which poses excessive risks to the health and safety of inmates like Ms. Wright.

47. Unconstitutional practices at the Jail are long-standing. In *Proctor v. Bd. Of Cnty. Comm'rs of Cnty. Of Pottawatomie,* No. CIV-07-654-M, 2010 WL 711198, at *4–5 (W.D. Okla. Feb. 25, 2010), this Court found evidence that PCPSCT maintained a practices of placing inmates in restraint chairs for prolong periods of time, chaining inmates to their bunks for weeks and using tasers regularly and unjustifiably in violation of internal policies.

48. There is a causal link between the above-described policies and customs, with respect to the inadequate provision of medical care to inmates, and Ms. Wright's Constitutional injuries.

49. The PCPSCT knew of, or should have known of, excessive risks to the health and safety of inmates like Ms. Wright, but failed to take reasonable measures to alleviate those risks.

50. Moreover, the deliberate indifference to Ms. Wright's serious medical needs, and the allowance of excessive force/use of restraints to be used on her, as summarized *supra*, was in furtherance of and consistent with policies, customs and/or practices which the PCPSCT promulgated, created, implemented or possessed responsibility for the continued operation of.

## CAUSES OF ACTION

### VIOLATION OF THE FOURTH/EIGHTH/FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES
### (42 U.S.C. § 1983)

**A. Individual Liability and Underlying Violation of Constitutional Rights**

- **Conditions of Confinement/Failure to Protect**

51. Paragraphs 1-50 are incorporated herein by reference.

52. At the time of the complained events, Ms. Wright had a clearly established constitutional right under the adequate conditions of confinement.

53. The right to be protected against violence committed is part of the conditions of confinement requirement afforded by the Constitution.

54. Any reasonable Jail employee knew or should have known those rights at the time of the complained of conduct as they were clearly established.

55. DOES ##1-5 had actual knowledge, or it was obvious, that Ms. Wright was at substantial risk of harm due to continued confinement at the Jail due to her obvious and emergent medical issues when she first presented to the Jail.

56. On information and belief, with deliberate indifference, DOES ##1-5 failed to protect Ms. Wright from harm, and disregarded the known, obvious and excessive risks of harm to Ms. Wright.

57. On information and belief, as a direct proximate result of DOES ##1-5 deliberate indifference, Ms. Wright suffered actual and severe physical and mental injuries, pain and suffering, emotional and mental distress, and death.

- **Excessive Force/Use of Restraints**

58. Paragraphs 1-57 are incorporated herein by reference.

59. On information and belief, the uses of force on, and restraint of, Ms. Wright, was excessive and objectively unreasonable under *Kingsley v. Hendrickson*, 576 U.S. 389 (2015).

60. On information and belief, Mr. Wright suffered significant physical pain and mental anguish, as a result of excessive uses of force/use of restraints perpetrated and/or allowed by DOES ##1-5.

61. Plaintiff is therefore entitled to compensatory damages in an amount to be determined at trial.

- **Denial of Adequate Medical Care**

62. Paragraphs 1-61 are incorporated herein by reference.

63. Detainees/Inmates like Ms. Wright have a constitutional right to adequate medical care while they are detained/incarcerated.

64. At the time she presented to the Jail, and at all times thereafter when she was incarcerated, Ms. Wright was in obvious need of emergent medical attention.

65. By failing to timely obtain medical attention for Ms. Wright, DOES ##1-5 were deliberately indifferent to her serious medical need(s).

66. This deliberate indifference was a direct and proximate cause of Ms. Wright's prolonged pain and suffering, a worsening of her condition, mental anguish, and death.

- **Municipal Liability**

67. Paragraphs 1-66 are incorporated herein by reference.

68. The aforementioned acts and omissions of DOES ##1-5 are causally connected with customs, practices, and/or policies which PCPSCT/Pottawatomie County promulgated, created, implemented and/or possessed responsibility for.

69. Those customs, practices, and/or policies are outlined in Paragraphs 40-50, *supra*.

70. PCPSCT/Pottawatomie County knew, must have known or should have known that, by maintaining such customs, practices, and/or policies, detainees like Ms. Wright were at substantial risk of harm. Nevertheless, PCPSCT/Pottawatomie County failed to take reasonable measure to alleviate the risk of harm.

71. PCPSCT/Pottawatomie County, through its failure to take reasonable remediable measures, has been deliberately indifferent to citizens', including Ms. Wright's, health and safety.

72. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Ms. Wright suffered injuries and damages as alleged herein.

**WHEREFORE,** based on the foregoing, Plaintiff prays this Court grant the relief sought, including but not limited to actual and compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

**SMOLEN & ROYTMAN**

/s/Daniel E. Smolen

Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
701 S. Cincinnati Avenue
Tulsa, Oklahoma 74119
(918) 585-2667 P
(918) 585-2669 F
danielsmolen@ssrok.com
bobblakemore@ssrok.com
bryondhelm@ssrok.com

*Attorneys for Plaintiff*